UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
                         EASTERN DIVISION

MACHECA TRANSPORT COMPANY,        )
et al.,                           )
                                  )
            Plaintiffs,            )
                                  )
      vs.                         )     No. 4:04-CV-178 CEJ
                                  )
PHILADELPHIA INDEMNITY            )
INSURANCE COMPANY,                )
                                  )
            Defendant.             )

## MEMORANDUM AND ORDER

Plaintiffs Macheca Transport Company, David Macheca, and Starlin Macheca bring this action to recover damages for breach of an insurance contract and vexatious refusal to pay. The parties have filed cross motions for summary judgment, pursuant to Fed.R.Civ.P. 56(c), and the issues are fully briefed.

### I. Background

On November 18, 2001, an ammonia leak occurred in Room 66 on the sixth floor of the plaintiffs' cold-storage warehouse. The ammonia leaked from a ruptured coil which was part of the warehouse's refrigeration system. The rupture occurred when the coil's support system detached from the ceiling. At the time of the incident, ice had accumulated on the outside of the pipes and coils of the refrigeration system.

Plaintiffs describe the damage to the warehouse as follows:

> **a substantial amount of liquid ammonia leaked out of the [ruptured coil] onto stored products on the sixth floor and onto the wooden floor on the sixth floor. . . . Once the liquid ammonia interacted with the snow and ice on the [ruptured coil], the stored products and the floor, the ammonia caused the snow and ice to melt such that the ammonia and water mixture seeped into the hardwood floor on the sixth**

**floor and ran toward the south and west walls on the sixth floor and then downward toward the first floor resulting in damage to the floor on the sixth floor and the walls in the southwest corner of the sixth through first floors.**

Pl. St. of Facts in Supp. of Mot. Summ. J. at ¶ 75-76.[1]

An all-risk policy that plaintiff had purchased from defendant Philadelphia Indemnity Insurance Company was in effect at the time of the incident. After defendant denied coverage for plaintiffs' claimed loss, plaintiffs filed this action. The Court entered summary judgment in defendant's favor and subsequently denied plaintiffs' motion to reconsider the order granting summary judgment for defendant. Plaintiffs appealed that decision, and the Eighth Circuit remanded the action with instructions for the Court to consider whether plaintiffs are entitled to coverage for losses which result from the "weight of snow, ice, or sleet." The "weight of ice" provision is an exception to two policy exclusions.

Plaintiffs also argued on appeal their claim for coverage under a policy provision that covers losses from "collapse." The collapse provision is a basis for coverage that is separate and independent from other coverage provisions of the policy. The Court

---

[1] Defendant disputes the plaintiffs' description of the damage to the warehouse, which is based on David Macheca's affidavit and deposition. Defendant insists that David Macheca admitted that he did not have personal knowledge of the occurrence. The Court finds that the cited page of Macheca's deposition, page 182, does not establish that he had no knowledge of the damage to the warehouse he owned. Macheca was asked: "Do you have any personal knowledge as to how that incident occurred with the coil falling from the ceiling?" Macheca replied, "No." The question posed to Macheca related to his knowledge of the coil falling, not the resulting damage to the warehouse.

of Appeals declined to consider the plaintiffs' "collapse" claim, because remand was necessary on the "weight of ice" claims, but it noted that plaintiffs were free to ask this Court to reconsider the collapse issue in light of the additional authority plaintiffs cited on appeal.[2]

Plaintiffs move for summary judgment on their complaint and for summary judgment in their favor on defendant's affirmative defenses, arguing that the ammonia leak and resulting damage are covered causes of loss under the policy, and the policy exclusions relied on by defendant do not apply to plaintiffs' loss. Defendant moves for partial summary judgment on plaintiffs' claim that the loss is covered under the policy's "collapse" provision and on plaintiffs' vexatious refusal claim.

**II.  Legal Standard**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  In ruling on a motion for summary judgment the court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underly-

---

[2] The Court of Appeals also instructed the Court to consider whether attorney John Horvath was the only witness available to testify in support of plaintiffs' vexatious refusal to pay claim. The Court will address that issue in a separate order.

ing facts. AgriStor Leasing v. Farrow, 826 F.2d 732, 734 (8th Cir. 1987). The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Fed. R. Civ. P. 56(c). Once the moving party has met its burden, the non-moving party may not rest on the allegations of his pleadings but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e). Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

**III. Discussion**

The insurance policy provided to plaintiffs by defendant is an "all risk" commercial insurance policy, which provides insurance coverage for all "fortuitous losses, unless the policy contains a specific provision expressly excluding the loss from coverage." Pakmark Corp. v. Liberty Mut. Ins. Co., 943 S.W.2d 256, 259 (Mo. Ct. App. 1997). The policy provides in relevant part:

> **A. Covered Causes of Loss**
> Covered Causes of Loss means Risks of Direct Physical Loss unless the "loss" is:
> 1. Excluded in Section B., Exclusions; or
> 2. Limited in Section C., Limitations; that follow.

**B. Exclusions** . . .

    2. We will not pay for "loss" caused by or resulting from any of the following:

        \* \* \*

    d. (1) Wear and tear;

        (2) Rust, corrosion, fungus, decay, deterioration, spoilage, contamination, hidden or latent defect or any quality in property that causes it to damage or destroy itself; . . .

        (4) Settling, cracking, shrinking or expansion;

        \* \* \*

        (6) Mechanical breakdown, including rupture or bursting caused by centrifugal force. However, this does not apply to any resulting "loss" caused by elevator collision;

        (7) Dampness or dryness of atmosphere; changes in or extremes of temperature; freezing or thawing.

        \* \* \*

    But if "loss" by the "specified causes of loss" or building glass breakage results, we will pay for that resulting "loss."

        \* \* \*

    i. Collapse, except as provided below in the Additional Coverage for Collapse. But if "loss" by any of the Covered Causes of Loss results at the described premises, we will pay for that resulting "loss."

    j. Discharge, dispersal, seepage, migration, release or escape of "pollutants."

    But we will pay for resulting "loss" to Covered Property when the discharge, dispersal, seepage, migration, release or escape of "pollutants" is caused by any of the "specified causes of loss."

        \* \* \*

3. We will not pay for "loss" caused by or resulting from any of the following. But if "loss" by a Covered Cause of Loss results, we will pay for that resulting "loss."

* * *

c. Faulty, inadequate or defective . . .

(4) Maintenance.

* * *

**C. Limitations**

1. We will not pay for "loss" to:

* * *

c. The interior of any "buildings," or to personal property in "buildings," caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

(1) The "buildings" first sustain damage by a Covered Cause of Loss to their roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

(2) The "loss" is caused by or results from thawing of snow, sleet or ice on the "buildings."

* * *

**D. Additional Coverage - Collapse**
We will pay for "loss" caused by or resulting from risks of direct physical "loss" involving collapse of "buildings" or any part of "buildings" caused only by one or more of the following:

1. The "specified causes of loss" or breakage of building glass, all only as insured against in this form;

2. Hidden decay.

* * *

**F. Definitions**

* * *

11. "Specified Causes of Loss" means the following: fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.[3]

In a diversity action, the interpretation of an insurance policy is a matter of state law. St. Paul Fire and Marine Ins. Co. v. Schrum, 149 F.3d 878, 880 (8th Cir. 1998) (citation omitted). When interpreting the language of an insurance contract, Missouri courts give the language its plain meaning, which is "the meaning that would be ordinarily understood by the layman who bought and paid for the policy." Shelter Mut. Ins. Co. v. Ballew, 203 S.W.3d 789, 794 (Mo. Ct. App. 2006) (citation omitted).

To determine the ordinary meaning, the Court consults standard dictionaries of the English language. Shahan v. Shahan, 988 S.W.2d 529, 535 (Mo. banc 1999) (citations omitted). Applying rules of contract construction is unnecessary when a contract provision is clear and unambiguous, and the Court may not create ambiguities to distort the language of an unambiguous policy. Id. Whether a policy is ambiguous is a question of law. Gulf Ins. Co. v. Noble Broadcast, 936 S.W.2d 810, 813 (Mo. banc 1997) (citation omitted). "An ambiguity exists when there is duplicity, indistinctness, or uncertainty in the meaning of the language of the policy. Language is ambiguous if it is reasonably open to different constructions."

---

[3] This Court previously has determined that the limitation in Section C.1.c does not apply and will not revisit the issue.

Id. (citation omitted). A policy found to be ambiguous is construed against the insurer, while an unambiguous policy is enforced as written, absent public policy to the contrary. Shelter Mut. Ins. Co., 203 S.W.3d at 794.

Phrases in insurance policies are not read "in isolation; instead, the policy is read as a whole." Id. If a word, standing alone, is "obscure or of doubtful meaning," such doubt can be removed by reference to associated words. Cochran v. Standard Acc. Ins. Co. of Detroit, Mich., 271 S.W. 1011 (Mo. Ct. App. 1925) (citations omitted).

The party claiming coverage under an insurance policy has the burden of proving that coverage exists. St. Paul, 149 F.3d at 880 (citation omitted). "An insurer claiming applicability of an exclusion clause has the duty to prove application, and such clauses are strictly construed against the insurer." Century Fire Sprinklers, Inc. v. CNA/Trans. Ins. Co., 23 S.W.3d 874, 877 n. 1 (Mo. Ct. App. 2000). A term in an exception to an exclusion is also "construed against the insurer, not the insured." Macheca Transp. Co. v. Philadelphia Indem. Ins. Co., 463 F.3d 827, 832 (8th Cir. 2006), citing Century Fire Sprinklers, Inc., 23 S.W.3d at 877 n. 1.

### A. Loss Caused by a "Specified Cause of Loss"

Plaintiffs first argument is that the loss involved the discharge of a pollutant (*i.e.*, ammonia) that was caused by a "specified cause of loss," specifically, the "weight of snow, ice, or sleet." As such, the loss was covered under the policy. See Policy Exclusions, Section B.2.j and Definitions, Section F. 11.

Defendant maintains that the policy language regarding the "weight of snow, ice, or sleet" does not apply to the accumulation of frozen condensation on refrigeration coils.[4]

Ice is defined simply as "frozen water." Merriam-Webster's Collegiate Dictionary (10th ed. 2002). In isolation, the word "ice" could refer both to ice as an element of the weather, or to ice caused by forces other than the weather. Sleet is defined as "frozen or partly frozen rain," while snow is "precipitation in the form of small white ice crystals formed directly from the water vapor of the air at a temperature of less than 32° F (0° C)." Id. When used in close proximity to "sleet" and "snow," it is clear that the term ice refers to ice as an element of the weather. Thus, the term ice as used in the "specified causes of loss" section is not ambiguous. The Court finds that, as a matter of law, ice accumulating as a result of the refrigeration process is not a specified cause of loss under the policy. Accordingly, the exception to the exclusions in B.2.d and B.2.j does not apply.

**B. Additional Coverage - Collapse**

The policy excludes loss due to collapse (see Policy, Section B.2.i), but plaintiffs purchased additional coverage for loss caused by or involving collapse (see Policy, Section D). The collapse provision provides an independent ground of coverage under

---

[4] Plaintiffs state that ice accumulated on the pipes when latent heat was removed from the rooms and became ice and snow on the pipes. Defendant disputes this characterization of the process, and asserts that frost accumulated when moisture in the air was converted to frost, and over time, frost can turn to ice.

the policy. Plaintiffs argue that the damage to the plaintiffs' warehouse constitutes "collapse" within the meaning of the insurance policy. Defendants assert that the collapse provision does not apply because the damage is not a collapse as a matter of Missouri law.

Under the doctrine enunciated in Erie R. Co. v. Tompkins, 304 U.S. 64 (1938), the Court is bound by the decisions of the Missouri Supreme Court when it construes Missouri law. St. Paul, 149 F.3d at 880. "In the absence of any controlling Missouri Supreme Court authority, we may consider 'relevant state precedent, analogous decisions, considered dicta . . . and any other reliable data.'" Id., quoting Lindsay Mfg. Co. v. Hartford Accident & Indem. Co., 118 F.3d 1263, 1267 (8th Cir. 1997). Decisions of state intermediate appellate courts are not binding on this Court, "but they are persuasive authority, and [the Court] must follow them when they are the best evidence of what Missouri law is." Garnac Grain Co., Inc. v. Blackley, 932 F.2d 1563, 1570 (8th Cir. 1991).

Existing Missouri common law limits "collapse" within the meaning of an insurance policy to a "falling or reduction to a flattened form or rubble." See Williams v. State Farm Fire and Cas. Co., 514 S.W.2d 856, 859 (Mo. Ct. App. 1974), citing Eaglestein v. Pacific Natl. Fire. Ins. Co., 377 S.W.2d 540 (Mo. Ct. App. 1965). These intermediate court decisions are the best evidence of what Missouri law is. The Court is not persuaded that the Missouri Supreme Court would decide the matter differently than the Missouri

Courts of Appeals have. Thus, the issue is whether the damage to plaintiffs' warehouse was a collapse under Missouri law.

Plaintiffs' expert witness, Thomas Bever, a mechanical engineer, reported that when he inspected Room 66 after the leak, the coil and piping system was "sagging toward the floor," and the support pipes holding up the coil were "bent." He opined that the ammonia leak was caused by "a bending failure of one of the pipes" when a portion of the pipe system "detached from the ceiling." When asked whether the coil had collapsed, Bever replied, "collapse seems like as good of a word as anything. . . . I might say structural failure. I might say collapse. I might say disconnecting and sagging." Bever denied that the system of refrigeration coils served any structural purpose for the building; he opined that it served only to cool the building. Defendant's expert, Thomas Richardson, described the damage in his report as follows: "the segment of the piping . . . is now deflected and sagging." Richardson further stated of the damage to the pipe: "I don't know if you can term that a collapse. It just – hangers came loose and it just dropped . . . A foot or so."

The Court finds that as a matter of law, the cracking, deflection, and sagging of a refrigeration pipe which serves no structural support function does not constitute "falling or reduction to a flattened form or rubble." See Williams, 514 S.W.2d at 859 (citation omitted). The damage to the refrigeration coil and piping system at plaintiffs' warehouse does not constitute collapse

as a matter of Missouri law. Thus, the policy provisions for collapse do not provide coverage for the plaintiffs' loss.

### C. Policy Exclusions

Defendant has raised several policy exclusions as affirmative defenses in this action. It claims that one or more of the exclusions in Sections B.2.d (including decay, cracking, mechanical breakdown including rupture, and changes in or extremes of temperature, among others), B.2.j (discharge of pollutants), and B.3.c(4) (faulty maintenance) apply to exclude coverage for plaintiffs' loss. Plaintiffs claim that the exclusions are inapplicable because there is more than one cause of loss, and the exclusions in Sections B.2 and B.3 apply only if the excluded event or condition is the sole cause of loss. Defendant responds that the cause of loss is a disputed issue of fact that precludes summary judgment.

Before it can be determined whether a cause of loss is a covered cause of loss, the proximate cause of the loss must be established. Under the proximate cause doctrine:

> [w]here a risk specifically insured against sets other causes in motion in an unbroken sequence between the insured risk and the ultimate loss, the insured risk is regarded as the proximate cause of the entire loss, even if the last step in the chain of causation was an excepted risk. . . . It is not necessarily the last act in a chain of events which is, therefore, regarded as the proximate cause, but the efficient or predominate cause which sets into motion the chain of events producing the loss.

Toumayan v. State Farm Genl. Ins. Co., 970 S.W.2d 822, 825 (Mo. Ct. App. 1998).

> The question of determining what losses directly and proximately flow from a specified covered peril cannot be reached until it is determined whether or not the exclusionary language clearly and unambiguously precludes recovery for such loss. . . . The parties to an insurance contract can contract out of the efficient proximate cause doctrine by exclusionary language.

Id.

Therefore, the first issue for the Court to decide is whether the parties contracted out of the efficient proximate cause doctrine by exclusionary language.

Missouri courts have construed insurance policies that contain three categories of exclusions identical to those in the instant policy. "Paragraph One" exclusions apply to loss or damage "caused directly or indirectly" by specified events, "regardless of any other cause or event that contributes concurrently or in any sequence to the loss." Pace Properties, Inc. v. American Manufacturers Mut. Ins. Co., 918 S.W.2d 883, 886 (Mo. Ct. App. 1996). Paragraph Two exclusions apply to "loss or damage caused by or resulting from any of the following [events]." Id. Paragraph Three exclusions apply to loss "caused by or resulting from any of the following [events]. But if loss by a Covered Cause of Loss results, we will pay for that resulting loss."

The presence of the "regardless of any other cause" language in a policy shows that the parties intended to contract out of the proximate cause doctrine. TNT Speed & Sport Center, Inc. v. American States Ins. Co., 114 F.3d 731 (8th Cir. 1997). The absence of the "regardless of any other cause" language, however, "indicates the exclusions . . . only apply when they are the sole

cause of the loss. It necessarily follows that if a covered cause of loss is <u>a</u> cause of loss," exclusions omitting the above language do not apply to foreclose coverage. <u>Id</u>. at 886 (emphasis in original). Likewise, because a Paragraph Three exclusion omits the "regardless of any other cause" language, such an exclusion only applies if the specified event is the sole cause of loss. <u>See</u> <u>Lower Chesapeake Assoc. v. Valley Forge Ins. Co.</u>, 532 S.E.2d 325, 331 note (Va. 2000) (construing a Paragraph Three exclusion and finding the exclusion did not apply when there was more than one cause of loss); <u>and</u> <u>Phillips Home Builders, Inc. v. Travelers Ins. Co.</u>, 700 A.2d 127, 129-30 (Del. Sup. Ct. 1997) (construing a Paragraph Three exclusion and finding the policy ambiguous when the excluded condition (settling) was the loss itself, not the cause of loss).

The Court finds that the parties did not include exclusionary language in Sections B.2 and B.3 of the policy, and thus they did not contract out of the efficient proximate cause doctrine as it relates to the causes of loss listed in those policy exclusions.

The cause of loss is disputed. In their petition, plaintiffs alleged that the loss was caused in part by the decay of the jute plugs that suspended the pipe support system from the ceiling. The parties' experts uniformly agreed that the weight of ice was <u>a</u> cause of the pipe falling, but they did not agree that the weight of ice was the sole cause.[5] The competing opinions of expert

---

[5] Plaintiffs' expert Thomas Bever opined that the refrigerated pipes' support system was attached to the ceiling of Room 66 with rods welded to lag screws screwed into jute fiber plugs embedded in the concrete ceiling. Bever described jute as a

witnesses as to the cause(s) of loss creates a fact dispute to be resolved by a jury. <u>Missouri Comm. Inv. Co. v. Employers Mut. Cas. Co.</u>, 680 S.W.2d 397, 404 (Mo. Ct. App. 1984). If the jury determines that there was more than one cause of loss, the exclusions in Sections B.2 and B.3 do not apply. The factual dispute over the cause(s) of the loss precludes summary judgment.

### D. **Vexatious Refusal**

Defendant moves for summary judgment on the plaintiffs' claim that the refusal to pay on the policy was vexatious.

To obtain a penalty for an insurance company's vexatious refusal to pay a claim, the insured must show that "the insurance company's refusal to pay the loss was willful and without reasonable cause or excuse, as the facts would appear to a reasonable and prudent person before trial." <u>Russell v. Farmers & Merchants Ins. Co.</u>, 834 S.W.2d 209, 221 (Mo. Ct. App. 1992)

---

natural cellulose plant fiber similar to wood. Bever attributed the loss to the decay of the jute plugs and/or the concrete into which they were inserted. Bever also stated that the weight of ice contributed to the loss, but that the ice weight did not exceed the capacity of the piping support system. Defendants' expert Thomas H. Richardson opined that the weight of the piping in combination with the weight of ice buildup likely caused the attachments that suspended the supporting pipes from the ceiling to gradually fail over a long period of time. Richardson further opined that the immediate cause of the ammonia leak was that the pipes dropped, causing the ammonia coil to crack. Finally, defendants' expert John Turner opined that the cause of loss was that the weight of ice overwhelmed the plugs, causing them to detach from the ceiling, upon which the pipe fell and leaked. Turner further found no visible signs of decay on the jute plugs, and he opined that it was unlikely that significant decay would occur in a cold storage facility. Defendant argues further that faulty or inadequate maintenance allowed ice to accumulate on the pipes, contributing to or causing them to fall.

(citation omitted); Mo. Rev. Stat. §§ 375.296, 375.420. Whether a refusal to pay is vexatious must be determined by the situation as presented to the insurer at the time it was called on to pay. 834 S.W.2d at 221. Whether the refusal is reasonable is a question of fact for the jury, rather than a question of law, but it can be determined as a matter of law based on undisputed facts. Id. Because the vexatious refusal statute is penal in nature, it must be strictly construed. Legg v. Certain Underwriters at Lloyd's of London, 18 S.W.3d 379, 387 (Mo. Ct. App. 1999) (citation omitted).

"An insurer that persists in its refusal to pay after it becomes aware that it has no meritorious defense is subject to a penalty for vexatious refusal." Russell, 834 S.W.2d 221. "Examples of evidence of vexatiousness include a refusal to pay based on an inadequate investigation and a denial of liability without stating any ground for denial." Id. (citation omitted). "A refusal to pay, based on a suspicion without substantial facts to support that suspicion, is vexatious." Mears v. Columbia Mut. Ins. Co., 855 S.W.2d 389, 394 (Mo. Ct. App. 1993) (citation omitted). The adequacy of the insurance company's investigation of the claim and the explanation given for denying the claim are relevant considerations for assessing whether a refusal to pay was vexatious. DeWitt v. American Family Mut. Ins. Co., 667 S.W.2d 700, 710 (Mo. banc 1984); see also Laster v. State Farm Fire and Cas. Co., 693 S.W.2s 195, 197 (Mo. Ct. App. 1995); and Francka v. Fire Ins. Exchange, 668 S.W.2d 189 (Mo. Ct. App. 1984).

If there is evidence that an insurance company's "reliance on the results of an investigation is not reasonable, the question is for the jury." Id. (citation omitted). The issue of vexatious refusal may not be submitted to the jury "unless there is something of a substantial nature in the case to indicate that the insurer has acted in bad faith and without reasonable cause in raising and relying upon the particular" issue of fact relevant to its denial of coverage. Sanderson v. N.Y. Life Ins. Co., 194 S.W.2d 221, 700-701 (Mo. Ct. App. 1946). See also Lee R. Russ and Thomas F. Segalla, 14 Couch on Insurance § 204.110 (3d ed. 2007) (To submit issues of whether the refusal to pay was vexatious and whether the insurance company made a reasonable investigation before denying coverage to jury, "there must be sufficient evidence that an inference that the insurer's refusal was improper could be drawn therefrom.").

"An insurance company may question and contest an issue of fact relating to its liability if it has reasonable cause to believe, and does believe, that there is no liability under its policy and that it has a meritorious defense." Groves v. State Farm Mut. Automobile Ins. Co., 540 S.W.2d 39, 42 (Mo. banc 1976). Where there is an open question of law or fact relating to a claim under an insurance policy, the insurer may insist upon a judicial determination of those questions without being penalized for vexatious refusal to pay. Legg, 18 S.W.3d at 387.

The ammonia leak occurred on November 18, 2001, and the plaintiffs reported the loss on November 26, 2001. The insurer

- 17 -

promptly contacted an adjuster, Bierman-Condray, which performed an inspection of the warehouse on November 28, 2001. At the adjuster's recommendation, defendant hired Richardson Engineering to conduct another inspection, which was performed on January 2, 2002. Defendant based its denial of coverage on the inspection reports.

Defendant first denied coverage in a letter dated February 13, 2002, from William Benecke, defendant's Senior Vice President of Claims. In the letter, Benecke wrote that the loss was not covered because the ammonia was released when the hanger rods supporting the coil system gradually failed over a long period of time. The letter quoted in full the exclusions and limitations in Sections B.2.d, B.2.i, B.2.j, and C.1.c, as well as the definition of specified causes of loss and the provision providing additional coverage for collapse.

Plaintiffs retained an attorney, and on June 10, 2003, requested that defendant reconsider its denial of coverage. Defendant subsequently reiterated its denial of coverage in letters from Benecke dated August 15, 2003, and September 23, 2003. In the August 15 letter, Benecke disagreed with plaintiffs' assertion that loss by weight of ice was covered under the policy, citing Section C.1.c of the policy. Benecke also noted that an additional applied, the exclusion in Section B.3.c.4 for faulty maintenance.[6] Finally,

---

[6] Plaintiffs have not argued that defendant's earlier failure to mention this exclusion constitutes a waiver of the right to assert the exclusion.

the September 23 letter reiterates Benecke's continuing disagreement with plaintiffs' position regarding coverage.

The defendant's investigation and the content of the letters denying coverage are not in dispute. When plaintiffs made the initial claim for coverage, defendant promptly conducted two inspections. Plaintiffs do not dispute the qualifications of the inspectors or the quality of their reports. Plaintiffs allege that the information in the reports does not support the defendant's conclusion that the loss was not covered. Plaintiffs also maintain that in the letters denying coverage, Benecke did not provide an explanation for the denial of coverage.

The Court finds that the explanations provided for the denial of coverage in Benecke's letters were sufficient and reasonable. Benecke listed the inspectors' conclusions as to the cause(s) of the ammonia leak and cited portions of the policy that were relevant to those conclusions. Further, there is no evidence to suggest that the defendant's investigation was inadequate, nor that its reliance on the inspection reports was unreasonable. Thus, the plaintiffs have not shown that the defendant's refusal to pay was willful or without reasonable cause or excuse. The Court will grant the defendant's motion for summary judgment on the vexatious refusal claim.

**IV. <u>Conclusion</u>**

The plaintiffs' loss does not fall within the "weight of snow, ice, or sleet" exception to the exclusions in Sections B.2.d and B.2.j of the policy.

The damage to the pipe in plaintiffs' warehouse does not constitute a "collapse" within the meaning of the policy, and thus there is no coverage for plaintiffs' loss under Section D of the policy.

Factual disputes regarding the cause of loss preclude summary judgment as to whether the exclusions in B.2.d, B.2.j, and B.3.c apply.

The defendant is entitled to summary judgment on plaintiffs' vexatious refusal claim.

Accordingly,

**IT IS HEREBY ORDERED** that defendant's motion for partial summary judgment [# 96] on plaintiffs' "collapse" claim is **granted.**

**IT IS FURTHER ORDERED** that defendant's motion for partial summary judgment [# 100] on plaintiffs' "vexatious refusal" claim is **granted.**

**IT IS FURTHER ORDERED** that plaintiffs' motion for summary judgment [# 95] is **denied.**

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 26th day of March, 2008.